UNITED MINE WORKERS OF AMERICA INTERNATIONAL UNION, United Mine Workers of America District 31, Richard L. Eddy, George Thomas Ice, and Delas A. Stuzen, Plaintiffs,

v.

MARTINKA COAL COMPANY and Eastern Associated Coal Corporation, Defendants.

No. CIV. A. 1:96–CV–156.

United States District Court, N.D. West Virginia.

March 26, 1999.

James M. Haviland, Crandall, Pyles, & Haviland, Charleston, WV, Barry A. Woodbrey, Jr., UMWA International Union, Sarah J. Starrett, Washington, DC, for Plaintiff United Mine Workers of America International Union.

Charles F. Donnelly, Hostler Law Offices, Charleston, WV, for Plaintiff United Mine Workers of America District 31, Richard L. Eddy, George Thomas Ice, Delas A. Stuzen.

C. David Morrison, Larry J. Rector, Steptoe & Johnson, Clarksburg, WV, Bryan R. Cokley, Steptoe & Johnson, Charleston, WV, for Defendants Martinka Coal Company and Eastern Associated Coal Corporation.

### *AMENDED FINDINGS FACT AND CONCLUSIONS OF LAW REGARDING DAMAGES UNDER THE WARN ACT*

KEELEY, District Judge.

In a memorandum opinion and order dated December 30, 1997, this Court found that the defendants had violated the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101–09 ("WARN" or the WARN Act) by laying off 89 workers on October 3, 1995, one day after they announced the closing of Martinka Coal Company's ("Martinka") Tygart River Mine. On April 6, 1998, the Court conducted a bench trial on the issue of the damages due to the aggrieved employees. The parties have stipulated to a number of facts and have also filed post-trial briefs, with detailed calculations of the amounts due.

## I. BACKGROUND.

The WARN Act requires that an employer provide sixty days notice to employees who would be affected before ordering a mass layoff or a plant closing. 29 U.S.C. § 2101(a). In the absence of such notice, the employees are entitled to

(A) back pay for each day of violation at a rate of compensation not less than the higher of—

(i) the average regular rate received by such employee during the last three years of the employee's employment; or

(ii) the final regular rate received by such employee; and

(B) benefits under an employee benefit plan described in section 1002(3) of this title [referring to the Employment Retirement Income Security Act] including the cost of medical expenses incurred during the employment loss which would have been covered under an employee benefit plan if the employment loss had not occurred.

The legislative history, at S.Rep. No. 62 100th Cong, 1st Sess. (1987), at 24, provides:

For violations of the notice provisions, damages are to be measured by the *wages and fringe benefits* (including reimbursement for medical expenses) the employee would have received had the plant remained open or the layoff been deferred until the conclusion of the notice period, less any wages or fringe benefits received from the violating employer during that period. This is in effect a liquidated damages provision, designed to penalize the wrongdoing employer, deter future violations, and facilitate simplified damages provisions. (emphasis added)

■ Although the primary focus of WARN is to provide notice and opportunity for retraining to soften the blow of unemployment, the damages allowed when that notice was not available should put the workers in the same position they would have been if the employer had obeyed the law. In this case, 211 mine workers received the 60 day notice and continued working, with all the attendant benefits of the National Bituminous Coal Workers Agreement ("NBCWA") of 1993. As the following discussion sets out, the 89 miners who received only one day's notice before layoff should not be in a worse position than the 211. By granting all of their wages and contractual benefits, this Court bestows no windfall, but only puts these employees where they should have been had Martinka given them appropriate notice of the layoff.

At the pretrial conference in this matter, the Court adopted this make whole philosophy as its guiding principle and held that the employees aggrieved should receive the contractual benefits of the NBCWA to the same extent that these were provided to the 211 other miners who received proper notice under WARN. The Court also ruled that wages would be paid for each "working" day in the sixty day notice provision, as opposed to every calendar day. *See Breedlove v. Earthgrains Baking Co.,* 140 F.3d 797 (8th Cir.1997); *Saxion v. Titan–C Manufacturing, Inc.,* 86 F.3d 553 (6th Cir.1996); *Frymire v. Ampex Corp.,* 61 F.3d 757 (10th Cir.1995); *Carpenters Dist. Council of New Orleans v. Dillard Dept. Stores, Inc.,* 15 F.3d 1275 (5th Cir. 1994), *cert denied,* 513 U.S. 1126, 115 S.Ct. 933, 130 L.Ed.2d 879 (1995); *but see, United Steelworkers of America v. North Star Steel Co.,* 5 F.3d 39 (3rd Cir.1993), *cert. denied,* 510 U.S. 1114, 114 S.Ct. 1060, 127 L.Ed.2d 380 (1994).

Finally, the Court determined that prejudgment interest was appropriate, and that the rate to be applied was the floating rate set under the federal post-judgment interest statute, 28 U.S.C. § 1961. The issue of attorney fees was left to be resolved after all other issues.

## II. FINDINGS OF FACT.

### A. Stipulations.

Without waiving any objections or arguments to the Court's previous rulings on

damages, the parties submitted three sets of stipulations which the Court will adopt as its findings of fact.

1. On October 2, 1995, Martinka Coal Company provided a WARN notice of its planned mine closing to the United Mine Workers of America ("UMWA"), the representative of the 89 claimant/employees.

2. On October 3, 1995, at 3:00 p.m., Martinka laid off 89 employees from its Tygart River mine.

3. Twenty-nine (29) employees were on the midnight shift and had already completed work for October 3, 1995, the day of their layoff, and thus received regular wages for that day. Thus, for those 29 employees, October 3, 1995, was the last day of work and October 4, 1995 was the first "day of violation."

4. Fifty (50) employees, assigned to the afternoon shift, were not permitted to work on October 3, 1995, and received no wages for that day. Thus, October 3, 1995, is the first "day of violation" for these employees.

5. Ten (10) employees were not actively at work on October 3, 1995, the day the layoffs took effect. Martinka listed them as employees who would be permanently laid off that day. As to these ten employees:

(a) Claimant Antok was injured on the job. His last day of work was August 29, 1995, and he was released to work as of October 15, 1996.

(b) Claimant Bates was off work due to illness. His last day worked was September 15, 1995, and he was released to return to work as of October 6, 1995.

(c) Claimant Boka was injured at work. Her last day worked was April 24, 1995, and she was released to return to work on January 29, 1996.

(d) Claimant Donajeris was suspended with intent to discharge for absenteeism. His last day worked was July 7, 1995. Plaintiffs are not claiming that he is entitled to any damages in this case.

(e) Claimant Eddy was on a leave of absence for union business at the time of layoff. He was not scheduled to return to active employment prior to December 1, 1995. Plaintiffs are not claiming that he is entitled to any damages in this case.

(f) Claimant Gregg was injured at work. His last day worked was July 19, 1995. He was never released to return to work. Instead, he applied for Social Security disability benefits in late 1996.

(g) Claimant Ray was injured at work. Her last day worked was August 7, 1995. As of the date of filing the stipulation, Ms. Ray had not been released to return to work.

(h) Claimant Rutherford was off work pursuant to a medical release from September 20, 1995 to October 2, 1995. He was released to return to work on that later date.

(i) Claimant Wilson was off work pursuant to a medical release from September 15, 1995 to October 2, 1995. He was released to return to work on the later date.

(j) Claimant Wolfe was injured at work. His last day of work was August 22, 1995. He was released to return to work on March 13, 1996.

6. Pursuant to the Court's ruling on liability, the "violation period" runs from October 3 (or 4), through and including December 2, 1995, for a total of 60 (or 59) "days of violation" depending on whether the employee worked on October 3.

7. Pursuant to the NBCWA, the laid off employees would have received pay for three holidays between October 3 and December 2, 1995: November 11, November 23, and November 24. Thus, the number of paid "working" days would be 44 or 45, depending on whether the employee was permitted to work his/her October 3, shift. The average number of "working" days is 44.61.

8. Nineteen of the claimants had birthdays during the period of violation.

9. The daily wage rate paid to each employee was $140.12 or $133.94, depending upon the pay grade. The average daily "straight time wage" for all claimants was $136.96 per day.

10. Each claimant received a pay supplement known as a "shift differential," which ranged from $2.40 to $4.95 per shift. The average shift differential per employee was $2.70 per shift.

11. Each claimant who was actively working was regularly scheduled for an eight hour shift.

12. The average cost of health care coverage for each claimant was $555 per month; actual cost of substitute coverage available under COBRA ranged from $304.55 to $913.70 per month.

13. The cost of life insurance benefits for each claimant was $13.86 per month.

14. The cost of accidental death and dismemberment benefits for each claimant was $2.24 per month.

15. The contribution rate to the UMWA 1974 Pension Fund under the NBCWA was $0.75 per hour worked in 1995. Certain inactive employees were also entitled to pension credits for hours which were (or should have been) counted as "sickness and accident" hours during the violation period, even though no contributions are due for those hours.

16. The contribution rate to the UMWA 1993 Benefit Fund under the NBCWA was $0.10 per hour worked in 1995.

17. The contribution rate to the UMWA/BCOA Labor Management Positive Change Process Fund under the NBCWA was $0.03 per hour worked in 1995. Plaintiffs, however, are not seeking these contributions as part of the damages.

18. The contribution rate for the UMWA/BCOA Training and Education Fund under the NBCWA was $0.08 per hour worked in 1995.

19. Under the NBCWA and Martinka's Individual Employee Benefit Plan, most employees were entitled to continued health care coverage for either six or twelve months after the layoff, depending on the number of hours worked prior to the layoffs.

20. Some of the claimants had unreimbursed medical expenses in the two month period after their extended coverage ended:

(a) Claimant Garcia, whose extended coverage expired April 30, 1996, had claims in an unknown amount from a May, 1996 accident.

(b) Claimant Keener, whose extended coverage expired October 31, 1996 had claims in an unknown amount.

(c) Claimant Latocha, whose extended coverage expired October 31, 1996, had claims in an unknown amount.

(d) Claimant Samargo, whose extended coverage expired April 30, 1996, had claims in the amount of $342.59.

20. The NBCWA provides that inactive employees are entitled to certain benefits, including vacation accrual and pay, pension, credits, holiday pay and extended medical benefits for up to twelve months after layoffs, illness or injury.

21. The NBCWA provides that employees receive credit for a year's service toward their pension if they work more than 1000 hours in a calendar year, or if their hours worked plus time receiving sickness and accident benefits equal at least 1000 hours.

22. Pursuant to the NBCWA, the employees who would have been actively at work during the period of the violation would have accrued two days of vacation.

23. Under the NBCWA, employees who are accidentally injured are entitled to "Sickness and Accident" benefits, including health care benefits, paid through a Sickness and Accidents Benefits Plan, which is an ERISA plan. Said benefits are payable "for a maximum of 52 weeks, regardless of the length of the employee's classified em-

ployment with the employer at the time of the accident." NBCWA Article XI, (b), (c) and (f).

24. The NBCWA, and the Martinka–District 31 Vacation Entitlement Pay Guidelines Agreement dated February 16, 1989, provided that employees who were injured at work and were receiving workers compensation were entitled to "full vacation entitlement," i.e., one vacation day per month, as long as they were employed during the "qualifying period," which, here, was June 1, 1994 through May 31, 1995. Each of the five employees on workers compensation were employed during the qualifying period and thus were entitled to vacation pay for one day per month, or a total of two days for the period of the violation.

25. None of the five employees on workers compensation received any vacation pay for the period of the violation.

26. The NBCWA also provides that sick and injured employees are entitled to compensation for all holidays for 364 days after their injury, at the time that the holiday occurs.

27. None of the five employees on workers compensation received holiday pay for a full year after their injury, and in particular none received any compensation for the Veteran's Day, Thanksgiving Day, Friday after Thanksgiving or birthday holidays to which they were entitled.

28. The NBCWA also provides that employees receiving "Sickness and Accident" and/or workers compensation benefits are entitled to pension credits for "S & A hours" for their entire period of eligibility, up to 52 weeks. Martinka need not make contributions for such hours, but must simply report them in order for the employee to receive the credit.

29. None of the five employees received any "S & A" Pension Credits or "Hours 3" for calendar year 1995; in particular, none received any credits for the period of the violation.

30. Each of the five employees suffered an employment loss within the meaning of WARN § 2104(a)(1) on October 3, 1995, the date of their layoffs.

31. There were 79 employees actively at work as of October 3, 1995, and two employees (Rutherford, Wilson) who had been released for work on October 2, 1995. One employee (Bates) was released for work on October 6, 1995. These 82 employees are entitled to back pay and all other benefits under the NBCWA.

**B. Court's Additional Findings of Fact.**

32. The parties stipulated that twelve of the employees had a historical record of regularly scheduled overtime, but argued during the bench trial for a different calculation. The plaintiffs sought overtime based on a calculation of the scheduled Saturday and Sunday work for the affected employees during the 60 day period immediately prior to the WARN Act violation, for an average of 4.88 Saturdays and .35 Sundays per employee. The defendants requested that the Court utilize the actual Saturday, Sunday and holiday work during the period of the violation, which would equal 1,012.55 Saturday hours, 1,035.5 Sunday hours, and 99 Veteran's Day hours for all of the employees.

33. Saturday overtime was paid at time and a half, Sunday overtime was paid at double time, and holiday overtime was paid at triple time.

**III. CONCLUSIONS OF LAW.**

As set forth in the background section above, the Court determined many of the legal issues at the pretrial conference. Nevertheless, several issues remain, whose difficulty is complicated by the lack of statutory guidance or precedent. To determine these issues, the Court will use as its linchpin the overarching principle that the aggrieved employees should be made whole, without windfall or anomaly, and with as little speculation as to the calculations as possible.

## A. *Overtime.*

 The WARN Act does not specifically address whether overtime is a part of damages under back pay; instead, it directs the Court to determine the "final regular rate" of the aggrieved employees. According to the history of the Tygart River mine that is available to the Court, Saturday and Sunday work was available, even regularly scheduled, for a number of employees. The parties have stipulated that twelve aggrieved employees had regularly scheduled overtime. Two major events occurred between August and October, 1995, however, including a major roof fall and a decision to close the mine, that must be factored into the analysis of the overtime issues.

In the 60 days from early August to October 1, 1995, the 82 aggrieved employees worked 400 Saturdays and 27 Sundays. In the 60 days following October 2, 1995, the 211 remaining employees worked approximately 135 Saturdays and 120 Sundays (Defendants' Supplemental Exhibit 9). Thus, while it appears that Saturday, Sunday work continued to be regularly available, it was at a much diminished rate as a consequence of the roof fall and planned mine closing. Nevertheless, because it was part of the employees' regular rate and continued to be available, the Court concludes that an award of overtime as part of the plaintiffs' damages is appropriate.

The parties, however, dispute the proper method for calculating the actual amount of overtime due. The plaintiffs propose the overtime actually worked by the 82 employees in August and September as a benchmark. This approach has the advantage of calculating the overtime from numbers which, in fact, are the employees' actual "final regular rate," particularly if the overtime was regularly scheduled. Unfortunately, because it ignores the decline in overtime available between October 3, and December 2, 1995, it violates the guiding principle that each employee should be compensated *as if* he or she had remained on the job throughout the violation period.

There is no real dispute that the amount of overtime hours actually worked by the 211 employees who remained on the job reflects all the overtime available at the mine after the plant closing decision, and the defendants advocate that using the amount of overtime hours actually available adheres to the make whole principle adopted by the Court. The Court concurs.

This amount of overtime is:

| | | |
|---|---:|---:|
| Saturday hours worked 1012.25 × 1.5(time and half) | | 1518.38 |
| Sunday hours worked 1035.50 × 2.0 (double time) | | 2071.00 |
| Veteran's Day hours worked 99 × 3.0 (triple time) | | 297.00 |
| Straight Time Equivalent (hours) | TOTAL | 3886.38 |
| Straight Time Equivalent (days) | | 485.79 |

The question is how to divide these 485.79 days of overtime among the employees. The defendants urge that because this was the entire universe of overtime available between October 3 and December 2, it should be shared equally by all employees, the 211 who worked it and the 82 who should have been allowed to work it. The plaintiffs reject this approach, arguing that such an analysis violates the two pay calculation methods—"average rate" or "final rate"—provided for under WARN, and that they will receive less than the 211, who have been paid in full for that time.

Throughout this case, the Court has consistently held that the employees who did not receive adequate notice of their termination under WARN should receive what they would have received had they continued working during the period of the violation. The fact that the roof fall and plant closing decision diminished the amount of overtime to be shared among 293 potential

workers is beyond peradventure. Thus, it follows that the continued employment of 89 more employees would have significantly reduced the amount of overtime available to each employee at the plant, and, consequently, the amount of overtime pay an aggrieved employee would have received if he or she had remained on the job throughout the violation period. Because the defendants' proposed methodology recognizes this fact, the Court will utilize it to calculate the average amount of overtime the aggrieved employees would have earned.

### B. *Other Damages.*

In their post-trial brief, the defendants argue that the plaintiffs are not entitled to vacation losses, two extra months of health care coverage, unreimbursed medical expenses, life insurance losses, two months of accidental death and dismemberment benefits, lost birthday holiday work, losses to the UMWA/BCOA Training and Education Fund and holiday pay for all of the employees. This argument ignores the Court's prior ruling that the aggrieved employees are entitled to be made whole, and to receive their wages and benefits *as if* they had continued working for the two month period between October 3 and December 2, 1995. WARN provides that "[t]he rights and remedies provided to employees by this Act are in addition to, and not in lieu of any other contractual or statutory rights and remedies of the employees and are not intended to alter or affect such rights and remedies . . . ." 29 U.S.C. § 2105. The implementing regulations promulgated by the Department of Labor, entitled "Purpose and Scope", explain:

> The provisions of WARN do not supersede any laws or collective bargaining agreements that provide for . . . additional rights or remedies . . . . Collective bargaining agreements may be used to clarify and amplify the terms and condi-

tions of WARN, but may not reduce WARN rights.

20 C.F.R. § 639.1(g)(1989).

Despite their contention otherwise, awarding these payments does not penalize the defendants for providing the contractually required benefits, which happen to be more than the minimum requirements of WARN. Rather, the Court's award recognizes that the defendants may not rely on their violation of the plaintiffs' rights under WARN to reduce their concomitant obligation to pay the employees their wages and benefits under the NBCWA.

The defendants also argue that they are entitled to an offset for payments made for premiums on behalf of the plaintiffs under ERISA. Under 29 U.S.C. § 2104(a)(2)(C), "[t]he amount for which an employer is liable . . . shall be reduced by—. . . any payment by the employer to a third party or trustee (such as premiums for health benefits or payments to a defined contribution plan) on behalf of and attributable to the employee for the period of the violation."

Under the NBCWA, the defendants were required to pay for insurance coverage for up to twelve months for each aggrieved employee *from the date of termination.* With the possible exception of claimants Boka and Gregg, Martinka paid these benefits from October 2, 1995. Under WARN, the employees are entitled to those benefits for the period of violation; under the contract, however, they were entitled to either six or twelve months of extended benefits *after* the date the mine closed.

Under § 2105 and the facts of this case, the Court concludes that no offset is available because the goal of WARN is to make the plaintiffs whole, as if they had worked during the period of violation. Thus, they are entitled to all the same benefits, for the same time period, as the 211 employees who remained on the job. Those employees received their extended

benefits from December 2, 1995, the date Martinka closed its Tygart Valley mine. As already stated, WARN cannot be used to reduce the benefits to which the aggrieved employees were otherwise entitled.

On the issue of unreimbursed medical expenses, the defendants argue that none of these costs were incurred within the violation period and are not part of any damages. Under § 2104(a)(1)(B), "employers who violate WARN are liable for the costs of 1) medical expenses incurred during an employment loss which would have been covered under an employee benefit plan if the employment loss had not occurred." An "employment loss" is defined at § 2101(a)(6) as "(A) an employment termination ... (B) a layoff exceeding 6 months ...."

Based on the record before it, the Court concludes that Mr. Sarango should be awarded his medical costs because they were incurred during his employment loss. As to the other persons who incurred medical bills, those expenses are neither quantified nor substantiated, and, therefore, are denied.

## C. *Back Pay Damages for Inactive Employees.*

■ Claimants Antok, Boka, Gregg, Ray and Wolfe were injured at work prior to October 2, 1995, and were not released to return to work prior to the date the mine closed. Plaintiffs contend that each of these five inactive employees, who were all receiving sickness and accident benefits or workers compensation at the time of their layoffs, are "aggrieved employees," entitled to full damages, including back pay.

These employees were not working at the time of the layoff and it is stipulated that they would not have returned to work during the 60 day violation period. Nevertheless, they suffered an employment loss within the meaning of WARN because, until they received the notice of permanent termination on October 3, 1995, they had a reasonable expectation that they would return to their jobs.

As the plaintiffs point out, several cases have held that temporarily laid off workers who have a reasonable expectation of recall are entitled to back pay damages when the employer violates the WARN Act because they suffer a job loss in the same sense that active employees do. *See Kildea v. Electro Wire Products, Inc.*, 792 F.Supp. 1046, 1050 (E.D.Mich.1992); *aff'd in relevant part*, 1998 U.S.App. LEXIS 9556, 144 F.3d 400 (6th Cir.1998); *Jones v. Kayser–Roth Hosiery, Inc.*, 748 F.Supp. 1292, 1298 (E.D.Tenn.1990). In *Ciarlante v. Brown & Williamson Tobacco Corp.*, 12 BNAIER Cas. 754 (E.D.Pa.1996), the court found that an employee on long term disability leave was entitled to back pay damages as compensation for the lack of WARN notice that he would be terminated. The court noted that any uncertainty as to whether he would return to work was irrelevant—the employee was "aggrieved" and entitled to damages.

The WARN regulations are in agreement:

> Workers on temporary layoff or on leave who have a reasonable expectation of recall are counted as employees. Any employee has a 'reasonable expectation of recall' when he/she understands, through notification or through industry practice, that his/her employment with the employer has been temporarily interrupted and that he/she will be recalled to the same or to a similar job.

20 C.F.R. § 639.3(a)(1).

Certainly, in August 1995, these employees had a reasonable expectation of recall. Brad Hibbs, Superintendent of Mines at Tygart River mines from July, 1992 to December, 1995, testified that the opening of the Tygart River Number 2 mine was a transformation time and that they had anticipated bringing the Number 1 mine employees and newly recalled employees in to assist with a real money-maker. Even after the roof fall, several avenues were pursued, and apparently not even Martin-

ka anticipated that the mine would close until just prior to October 2, 1995.

To be sure, coal mining in this state is somewhat uncertain, and layoffs and closings occur often. But at the time these five employees went on workers' compensation, they would have had every expectation that their jobs would be available when they were able to return. Would the 60 day notice, if properly given, have made any difference? Under *Ciarlante,* that is irrelevant. The WARN Act requires the notice, and requires damages if the notice is not given.

As to the argument that these inactive employees are receiving a windfall by obtaining back pay in addition to their workers' compensation benefits, the Court finds this is no more double-dipping than is the fact that the active employees obtained unemployment compensation after the layoff. Furthermore, permitting such recovery is consistent with the legislative history of WARN:

> This is in effect a liquidated damages provisions (sic), designed to penalize the wrongdoing employer, deter future violations and facilitate simplified damages proceedings.

S.Rep. No. 62, 100th Cong., 1st Sess. 24 (1987).

The Court, therefore, concludes that the five inactive employees, Antok, Boka, Gregg, Ray and Wolfe, are entitled to back pay damages to the same extent as the active employees.

### D. Contractual Benefits for the Five Inactive Employees.

In the final set of stipulations, the defendants agreed that these five inactive employees suffered an employment loss within the meaning of WARN, § 2104(a)(1), on October 3, 1995, and are entitled to damages for the items and in the amounts listed in Plaintiffs' Revised Expert Report. Joint Exhibit 1. The defendants further agreed that each of the five employees was entitled to two days lost vacation pay, three days of holiday pay, 320 hours of "S & A" pension credits, and also to health care benefits and "S & A" benefits under the NBCWA Article XI.

In their post trial brief, however, the defendants argue that these items are neither wages nor ERISA benefits, and are not recoverable under § 2104 of WARN.

As noted earlier, the concept of back pay includes not only wages, but also all the fringe benefits the employee would have earned had the violation not occurred. *See Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 197, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). *See also H.R. Conf. Rep.* No 100–576, 100th Cong., 2d Sess. 1052 (1988)("for each day of violation, an employer is liable to each aggrieved employee for the amount paid in wages and benefits to such employee prior to the layoff"); 29 U.S.C. § 2105. These inactive employees are no different from the other 82 laid off workers; as to these benefits, they are entitled to them for the period of violation.

### E. Contributions to the 1974 Pension Fund and the 1994 Benefit Fund.

These are ERISA plans, and the defendants concede they are liable for the contributions under 29 U.S.C. § 2104(1)(B).

## IV. CONCLUSION

In conclusion, the Court calculates the plaintiffs' damages as follows:

### CALCULATIONS.

#### A. Wage Losses.

(1) Average Total Wage Per Employee Per Day

| | |
|---|---|
| Straight Time Wage | $ 137.03 |
| Shift Differential | 2.72 |

Total Wage \$ 139.75

(2) Days of Violation

| | |
|---|---:|
| Average Number of Working Days and Holidays | 44.61 |
| Saturday Hours Worked | 1012.25 |
| Sunday Hours Worked | 1035.50 |
| Veteran's Day Holiday Hours Worked | 99.00 |
| Straight Time Equivalent (Sat.hours × 1.5) | 1518.38 |
| Straight Time Equivalent (Sun hours × 2) | 2071.00 |
| Straight Time Equivalent (Holiday × 3) | 297.00 |
| Straight Time Equivalent TOTAL HOURS | 3886.38 |
| Straight Time Equivalent (DAYS) | 485.79 |

485.79 Days ÷ 293 Workers = 1.66 Straight Time Equivalent Days Per Person

| | | |
|---|---|---:|
| (3) | Working Days | 44.61 |
| | Straight Time Equivalent Days | 1.66 |
| | TOTAL DAYS PER PERSON | 46.27 |

(4) Total Loss Wages

87 Employees (82 Active and 5 Inactive) × \$139.75 × 46.27 days = \$562,562.00 Total Lost Wages

**B. Benefits.**

| | |
|---|---:|
| Health Care | \$ 93,240.00 |
| Health Care out of pocket | 343.00 |
| Life Insurance | 2,328.00 |
| AD & D | 376.00 |
| Vacation Pay | 24,317.00 |
| Birthday Holiday Work | 5,031.00 |
| UMWA 1974 Pension Fund | 24,511.00 |
| UMWA 1993 Benefit Fund | 3,268.00 |
| UMWA/BCOA T & E Fund | 2,367.00 |
| Holiday Pay for Inactive Employees | 2,252.00 |
| TOTAL LOSS BENEFITS | \$158,033.00 |

**C. Total Lost Wages & Benefits.** \$720,595.00

The Court directs the parties to meet and calculate the amount of pre-judgment and post-judgment interest, pursuant to these rulings, and to submit this to the Court within ten (10) days following the entry of this Order. The parties are also notified that there will be a telephone status conference to discuss the issue of attorneys' fees on **Friday, March 26, 1999** at **11:00 a.m.** Counsel for the plaintiffs is to initiate the call.