

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-29-2008

# Omer Masse v. APA Transp Corp

Precedential or Non-Precedential: Precedential

Docket No. 07-1050

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Omer Masse v. APA Transp Corp" (2008). *2008 Decisions.* Paper 568.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/568

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————

Nos. 07-1050, 07-1051, 07-1052

————

IN RE: APA TRANSPORT CORP. CONSOLIDATED
LITIGATION

TEAMSTERS LOCAL UNION NO. 560,
Appellant No. 07-1050

————

IN RE: APA TRANSPORT CORP. CONSOLIDATED
LITIGATION

BRIAN CAMPBELL; JOHN CRONIN JR.;
ANDREW IMPERATORE; OMER MASSE;
GARY PEGORARO; DEBORAH TETRO;
and RICHARD YURCISIN,
Appellants No. 07-1051

————

IN RE: APA TRANSPORT CORP. CONSOLIDATED
LITIGATION

TEAMSTERS PENSION TRUST FUND
OF PHILADELPHIA AND VICINITY;
TEAMSTERS HEALTH AND
WELFARE FUND OF PHILADELPHIA
AND VICINITY; and TEAMSTERS
LOCAL NO. 470,
Appellants No. 07-1052

————

On Appeal from the United States District Court
for the District of New Jersey
Honorable Garrett E. Brown, Jr.

(Civ. A. No. 02-CV-3480)
_____


_____

Argued March 11, 2008
_____

Before: FUENTES, CHAGARES and ALDISERT, <u>Circuit Judges.</u>

(Opinion Filed: August 29, 2008)
_____

David Grossman
Cohen, Leder, Montalbano & Grossman
1700 Galloping Hill Road
Kenilworth, NJ  07033
*Counsel for Appellant*
*Teamsters Local Union No. 560*

John C. Lankenau
Lankenau & Miller
Suite 10A
20 West 86th Street
New York, NY 10024
*Counsel for Appellants*
*Brian Campbell; John Cronin Jr.; Andrew Imperatore; Omer*
*Masse; Gary Pegoraro; Deborah Tetro; and Richard Yurcisin*

Paul A. Friedman                    **[ARGUED]**
Blank Rome
405 Lexington Avenue
The Chrysler Building
New York, NY 10174
*Counsel for Appellants*
*Teamsters Local Union No. 470; Teamsters Pension Trust Fund*
*of Philadelphia  and Vicinity; Teamsters Health and Welfare*

*Fund of Philadelphia and Vicinity*

Keith R. McMurdy                    **[ARGUED]**
Fox Rothschild
100 Park Avenue
Suite 1500
New York, NY 10017
*Counsel for Appellees*
*APA Truck Leasing, APA Transport Corp.*

Shea H. Lukacsko
Fox Rothschild
75 Eisenhower Parkway
Roseland, NJ  07068
*Counsel for Appellees*
*APA Truck Leasing, APA Transport Corp.*

---

OPINION

---

FUENTES, <u>Circuit Judge</u>.

APA Transport Corporation ("APA Transport") closed its facilities and terminated all of its employees on February 20, 2002. It had informed its employees of the impending shutdown and layoffs only a week earlier.  Following the shutdown, a number of non-union and union employees, along with certain Employee Retirement Income Security Act ("ERISA") funds, filed suit against APA Transport and affiliated entities claiming that they had violated the notice provisions of the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2101, <u>et seq.</u>, which requires that an employer provide 60 days' notice before a plant shutdown unless the employer qualifies for certain exceptions.  On appeal, we address:  (1) whether the ERISA funds have standing to sue under the WARN Act; (2) whether APA Transport and an affiliated company, APA Truck Leasing, could be considered liable pursuant to the WARN Act as a "single employer"; and (3) whether APA Transport qualifies for the

"faltering company" exception to the notice provisions of the WARN Act.

## I.    Background

### A.    Facts of the Case

APA Transport was a trucking business founded in 1947 and dissolved on February 20, 2002. APA Transport's main offices were located in North Bergen, New Jersey, with other terminals and facilities throughout the Northeast. Pursuant to collective bargaining agreements, APA Transport's union employees were represented by Teamsters Local 470 ("Local 470") and Teamsters Local 560 ("Local 560").

The co-owners of APA Transport – Arthur Imperatore, Sr. and Armand Pohan – also owned more than 30 other companies at the time APA Transport closed, many of which continue to operate today. One of these companies is APA Truck Leasing, which is involved in leasing motor vehicles. Imperatore and Pohan were officers and directors of both APA Transport and APA Truck Leasing and – along with Fred Astle and Burton Trebour – directed the day-to-day affairs of both companies. The parties to this appeal dispute the degree to which APA Transport and APA Truck Leasing were connected to each other.[1] Appellants[2] argue that the two companies were closely related, highlighting the following facts: the companies made non-formal loans to one another; APA Transport provided non-union employees of APA Truck Leasing with medical, pension, 401(k) and workers' compensation benefits; non-union employees of APA Truck Leasing received the same benefits as APA Transport employees; and APA Transport provided payroll, office supplies, accounting and other services for

---

[1] This dispute is significant because the degree to which the two entities were related determines whether they constitute a "single employer" under the WARN Act. See discussion infra at Section II.C.

[2] Appellants are the Employee Plaintiffs and the Plaintiff Funds. See definition infra at Section I.B.

4

APA Truck Leasing. APA Transport, by contrast, contends that the two companies operated separately, and points to the following facts: APA Transport and APA Truck Leasing did not share employees; the companies handled the discipline of employees separately; the companies had separate contracts with different unions; and the companies maintained separate financial books and records.

On December 19, 1996, APA Transport entered into a Loan and Security Agreement ("Loan Agreement") with Transamerica Business Capital Corporation ("Transamerica"). The Loan Agreement provided APA Transport with a revolving credit facility that allowed it to borrow up to $40 million, secured by real property, equipment and accounts receivable. The Loan Agreement required APA Transport to provide Transamerica with regular reports as to outstanding accounts receivable and to comply with certain financial covenants.

Following the execution of the Loan Agreement, APA Transport suffered consistent losses. As a result, it defaulted on loan covenants on multiple occasions in 1999, 2000 and 2001. After each default, Transamerica and APA Transport negotiated agreements whereby the breaches were waived and/or the applicable covenants were amended. APA Transport was also negatively affected by the September 11, 2001 terrorist attacks because it conducted a significant amount of business in the New York City metropolitan area; following the attacks, APA Transport reported that its revenues fell 30 percent. As a result, APA Transport's reduced accounts receivable limited the amount of money it could continue to borrow from Transamerica under the Loan Agreement.

On October 24, 2001, Transamerica convened a meeting with APA Transport at Transamerica's offices to discuss how APA Transport was "going to operate going forward, given [its] losses." (Joint Appendix ("J.A.") 520a-521a.) The attendees included Pohan and Imperatore; Transamerica's president, Steven Fischer; and Transamerica representatives Christopher Norrito and Michael Burns. The Transamerica representatives expressed concern about the state of APA Transport's finances, communicated to Pohan and

Imperatore that Transamerica would not continue to fund APA Transport's operating losses and indicated that Pohan and Imperatore would need to put additional capital into the company before Transamerica would extend any additional financing.[3] APA Transport stated that it would seek additional financing, and Transamerica responded by stating that its "options were open" for extending the Loan Agreement. (J.A. 1465a.) However, APA Transport made no formal request at the meeting to secure additional financing or to extend the Loan Agreement.

In November 2001, Transamerica notified APA Transport that it was once again in default on the Loan Agreement. On December 10, 2001, Transamerica agreed to a fifth waiver and amendment to the Loan Agreement to cure those defaults.

The Loan Agreement was set to expire on February 28, 2002 (the "Termination Date"), at which point the entire loan amount was due. Under the Loan Agreement, any requests for extensions or renewals of the Loan Agreement were required to be in writing 60 days prior to the Termination Date. However, as of the end of 2001, APA Transport had made no written or oral request for Transamerica to extend or renew the Loan Agreement; the parties had not begun to gather the documentation required for such an extension or renewal; and APA Transport officials had taken no steps to invest additional capital in the company.

On January 2, 2002, Astle sent a letter (the "Astle Letter") to Norrito requesting additional financing for APA Transport, to be secured by mortgages on two freight terminals owned by companies related to APA Transport. The letter asserted that each of the terminals was worth $4 to $5 million, and requested that Transamerica extend an additional loan of $5 to $6 million to be secured by mortgages on these properties. There is no evidence that work was undertaken on the preparation of appraisals,

---

[3] It was clear to both parties at this point that Transamerica was the only financial institution that would provide APA Transport with additional financing, given that APA Transport was so encumbered by the obligations of the Loan Agreement.

environmental reports or environmental indemnity agreements for these properties, all which would have been necessary to obtain the mortgages. Moreover, the Astle Letter did not specifically seek an extension or renewal of the Loan Agreement, nor did it mention the impending Termination Date.

On January 15, 2002, a second meeting was held between Transamerica and APA Transport to discuss the state of APA Transport's finances, with Pohan, Astle, Norrito, Burns and Fischer in attendance. At the meeting, Transamerica made no commitment with respect to additional financing; it also neither indicated that it would extend its loan beyond the Termination Date nor increased its lending to APA Transport.

On January 24, 2002, Pohan sent a letter to Fischer (the "Pohan Letter"). The letter stated that he was "renewing [the] request that Transamerica provide [APA Transport] with an additional loan to carry us through this recessionary winter and the losses attendant thereto." (J.A. 1042a.) It reiterated the offer made in the Astle Letter for APA Transport to arrange to secure additional financing with mortgages on the two terminals. The letter concluded by stating that Transamerica's "prompt response to this request is most urgent, since the ability of the ownership to fund the anticipated losses in the next few weeks has just about been depleted." (Id.)

Transamerica did not respond to the Pohan Letter with a credit memorandum or credit approval. In the first week of February, Pohan had a phone conversation with a Transamerica representative, during which Pohan was informed that it would be difficult to persuade Transamerica's credit department to approve additional financing unless APA Transport's owners put additional money into the company. Then, on February 13, 2002, Transamerica sent APA Transport a letter formally notifying it that the Loan Agreement would terminate pursuant to its terms on February 28, 2002, and that Transamerica would not agree to extend the Loan Agreement to provide additional financing.

Unable to continue functioning without such financing, APA Transport shut its terminals on February 20, 2002. The first

7

notice to employees of the shutdown was given in a February 11, 2002 letter from APA Transport to the president of Local 470, which was received on February 14, 2002. The letter stated that in accordance with the WARN Act, it was providing notice that APA Transport was permanently closing its terminal in Philadelphia, Pennsylvania effective February 20, 2002. The letter further stated that all employees at the location would be permanently laid off, and that APA Transport had given a "shortened" WARN notice because it had been

> actively seeking financial assistance to alleviate its severe economic problems. If APA [Transport] had provided an earlier shutdown notice, it would have precluded our ability to obtain the financing necessary to continue in business. APA [Transport] has now been notified that its request for this critical financing has been rejected and, accordingly, it can no longer afford to operate.

(J.A. 1047a). On February 14, 2002, APA Transport sent similar letters to representatives of Local 560 and to all non-union employees.

As a result of the shutdown, all APA Transport employees – those represented by Local 470, represented by Local 560 and non-union employees – were terminated. APA Transport paid no wages or benefits to any employee after February 22, 2002.

Approximately six weeks after the shutdown, APA Truck Leasing lent APA Transport between $10 and $15 million. The loan was secured by an Open-End Mortgage and Security Agreement dated June 5, 2002 on APA Transport's North Bergen terminal facility.

B.      **Procedural History**

Several complaints were filed against APA Transport, APA Truck Leasing and certain other related entities (the "APA

8

Entities")[4] beginning in 2002. These complaints alleged violations of ERISA and/or the WARN Act and sought back wages and benefits. One set of plaintiffs was comprised of two ERISA funds, the Teamsters Pension Trust Fund of Philadelphia and Vicinity and the Teamsters Health and Welfare Fund of Philadelphia and Vicinity (Local 470) (together, the "Plaintiff Funds"), which alleged violations of the WARN Act and ERISA. A second set of plaintiffs was comprised of a class of non-union employees and Local 560 (the "Employee Plaintiffs") who alleged violations of the WARN Act and ERISA.[5]

The cases were consolidated in the United States District Court for the District of New Jersey in May 2003,[6] after which both the Plaintiff Funds and the Employee Plaintiffs filed multiple amended complaints that added certain parties. Thereafter, APA Transport moved for summary judgment as to the claims asserted by the Plaintiff Funds, alleging that the Plaintiff Funds lacked standing. The Plaintiff Funds and the Employee Plaintiffs simultaneously filed motions for partial summary judgment asserting that the Plaintiff Funds had standing under the WARN Act; that APA Transport, APA Truck Leasing and the APA Entities should be considered a "single employer" for WARN Act

---

[4] These entities are: APA International Corporation; APA World Transport Corporation; Imperial Delivery Service, Inc.; and Transport Flexonomics, Inc. The Plaintiff Funds and the Employee Plaintiffs have not appealed the District Court's decision with respect to the APA Entities.

[5] There was a third plaintiff, the Freight Drivers and Helpers Local Union Number 577 ("Local 577"), which alleged violations of the WARN Act. The District Court granted summary judgment in favor of APA Transport, APA Truck Leasing and the APA Entities against Local 577 because those claims were brought by employees at facilities with fewer than 50 full-time employees and thus were statutorily excluded. Local 577 did not appeal the District Court's decision.

[6] The District Court had jurisdiction over these cases pursuant to 28 U.S.C §§ 1337 and 1367, and 29 U.S.C. § 2104(a).

purposes; and that APA Transport did not qualify for the so-called "faltering company" exception to the WARN Act. APA Transport then filed a cross-motion for summary judgment as to the "faltering company" defense. At the same time, APA Truck Leasing and the APA Entities filed cross-motions for summary judgment regarding the "single employer" issue.

On December 7, 2006, without oral argument, the District Court granted APA Transport's summary judgment motion as to claims asserted by the Plaintiff Funds, holding that the Plaintiff Funds lacked standing under the WARN Act. The District Court also granted summary judgment to APA Transport on the "faltering company" defense. Finally, it granted APA Truck Leasing and the APA Entities summary judgment on the "single employer" issue, concluding that none of those companies could be considered a "single employer" with APA Transport. On December 13, 2006, the District Court dismissed all remaining issues as moot, and on December 29, 2006, entered final judgment.

A timely appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. Discussion

There are three issues on appeal. We first consider whether the District Court was correct to conclude that the Plaintiff Funds do not have standing under the WARN Act. Next, we determine whether the District Court was correct to conclude that APA Transport and APA Truck Leasing did not constitute a "single employer" for WARN Act purposes. Finally, we address whether the District Court was correct to conclude that APA Transport qualified for the "faltering company" exception to the WARN Act notice requirement.

Our review of all three legal issues, which were decided at summary judgment, is de novo. TKR Cable Co. v. Cable City Corp., 267 F.3d 196, 199 (3d Cir. 2001). We construe the facts in the light most favorable to the nonmoving party. Id. Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . [the moving party] is entitled to judgment as

10

a matter of law."  Fed. R. Civ. P. 56©.

## A.    Brief Overview of the WARN Act

The WARN Act was enacted in 1986 in response to extensive worker dislocation that occurred in the 1970s and 1980s when employees lost their jobs, often without notice, as companies were merged, acquired or closed.  The purpose of the WARN Act is to protect workers by obligating employers to give their employees advanced notice of plant closings.  This allows workers who will be laid off time to "adjust to the prospective loss of employment, to seek and obtain alternative jobs and . . . to enter skill training or retraining that will allow [them] to successfully compete in the job market."  Hotel Employees & Rest. Employees Int'l Union Local 54 v. Elsinore Shore Assocs., 173 F.3d 175, 182 (3d Cir. 1999) (citation omitted).

The WARN Act provides that covered employers – generally, those that employ at least 100 full-time workers at a single site of employment – must provide 60 days' written notice before a closing or mass layoff.  See 29 U.S.C. § 2101 et seq.  The Act dictates that notice be given to affected employees or their union representative, the state dislocated worker unit and the chief elected official of a unit of local government.  Id. § 2102(a). Employers that violate the WARN Act are liable to their employees for back pay and benefits for each day notice is not provided, up to a maximum of 60 days.  Id. § 2104.  The WARN Act contains three exceptions to the notice requirement:  the "faltering company" exception, the "business circumstances" exception and the "natural disaster" exception.  Id. § 2102(b); 20 C.F.R. § 639.9.

## B.         Standing to Sue Under the WARN Act

The Plaintiff Funds, joined by the Employee Plaintiffs, contend that the District Court erred when it concluded that the Plaintiff Funds did not have standing to bring suit under the WARN Act.  For the reasons that follow, we conclude that the District Court correctly determined that the Plaintiff Funds lack standing.

11

The WARN Act limits employer liability "to each aggrieved employee who suffers an employment loss."  29 U.S.C. § 2104(a)(1).  It further enumerates who may bring a suit:

> A person seeking to enforce such liability, including a representative of employees or a unit of local government aggrieved under paragraph (1) or (3), may sue either for such person or for other persons similarly situated, or both, in any district court of the United States for any district in which the violation is alleged to have occurred, or in which the employer transacts business.

Id. § 2104(a)(5). The WARN Act defines the term "representative" with reference to labor organizations, which are the "exclusive representative[s] of employees" under federal labor law.  Id. § 2101(a)(4).  A "unit of local government" is defined as a "political subdivision of a State."  Id. § 2101(a)(7).

The District Court concluded that the Plaintiff Funds did not have standing to sue under 29 U.S.C. § 2101(a)(4) because, although employee welfare and benefit plans are included in those benefits to which an aggrieved employee is entitled under the WARN Act, the Plaintiff Funds themselves "cannot be 'aggrieved employees' under the WARN Act."  In re APA Transport Corp. Consol. Litig., No. 02-CV-3840, 2006 WL 3534029, at *6 (D.N.J. Dec. 7, 2006).  In support of this position, the District Court adopted the analysis of United Mine Workers of America, District 12 v. Midwest Coal Co., No. TH 99-C-141-T/H, 2001 WL 1385893 (S.D. Ind. Aug. 31, 2001).  There, plaintiffs alleging a violation of the WARN Act sued to recover, inter alia, contributions that their employers were required to have made to certain benefit funds during the violation period.  Midwest Coal, 2001 WL 1385893, at *3.  The court ruled that the plaintiffs were not entitled to recover the amount of the contributions because the WARN Act set forth the exclusive remedies for a violation of the Act in 29 U.S.C. § 2104, and contributions did not qualify as one of the remedies explicitly listed.  Id. at *10.  In addition, the court concluded that the plaintiffs were not entitled to recover contributions because "[n]one of the funds for which [the]

12

[p]laintiffs seek contributions by [the defendant] qualifies as an 'aggrieved employee' under the [WARN] Act." Id. The District Court reasoned that if the benefit plans in Midwest Coal could not be considered "aggrieved employees" under the WARN Act, neither could the plans here; and consequently, the Plaintiff Funds did not have standing. In re APA Transport Corp., 2006 WL 3534029, at *6.

On appeal, APA Transport argues that this reasoning is correct, and further argues that if employees are not entitled to ERISA contributions as part of their WARN Act damages, then the Plaintiff Funds have no claim upon which to sue. The Plaintiff Funds respond that the funds in Midwest Coal were not ERISA funds and argue that the analysis there is consequently not transferrable to this case. The Plaintiff Funds also cite United Mine Workers of Am. Int'l Union v. Martinka Coal Co., 45 F. Supp. 2d 521 (N.D. W.Va. 1999), aff'd, 202 F.3d 717 (4th Cir. 2000), for the proposition that contributions to ERISA plans are benefits that fall under the WARN Act damages rubric set forth in 29 U.S.C. § 2104(1)(B).[7] The Plaintiff Funds argue that because they are charged, pursuant to ERISA, with aggressively pursuing the funds to which they are entitled on behalf of the employees whom they serve, and because contributions to ERISA plans are benefits that can be recovered as damages when there has been a WARN Act violation, the Plaintiff Funds should be entitled to sue to recover those contributions.

We believe the parties' arguments are premature. The initial issue we must resolve – a question that both the District Court and the parties did not address – is whether the Plaintiff Funds can be considered "person[s]" permitted to seek enforcement of the WARN Act pursuant to 29 U.S.C. § 2104(a)(5). This is an issue of first impression in this Circuit and it appears that no other circuit has considered whether benefit plans should be considered

_____

[7] The court in Midwest Coal expressly disagreed with the decision reached by the court in Martinka Coal. See Midwest Coal, 2001 WL 1385893, at *10 n.7 (concluding that Martinka Coal was "wrongly decided").

13

"person[s]" under 29 U.S.C. § 2104(a)(5).

As noted above, the relevant provision of the WARN Act provides that a civil suit may be brought by "[a] person seeking to enforce such liability, including a representative of employees or a unit of local government aggrieved under paragraph (1) or (3)." 29 U.S.C. § 2104(a)(5). The WARN Act fails to define the word "person." The rules of construction for federal statutes broadly define "person" as "includ[ing] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals" unless the "context [of the statute] indicates otherwise." 1 U.S.C. § 1.

Here, there is nothing in the context of the statute that indicates to us whether Congress intended to more narrowly proscribe those "person[s]" who can enforce the WARN Act. Nor does the language of the pertinent provision provide a clear answer. Rather, it states that the category "includ[es] representative[s] of employees or [] unit[s] of local government aggrieved under paragraph (1) or (3)." 29 U.S.C. § 2104(a)(5) (emphasis added). It is a well-established canon of statutory construction that when the word "including" is followed by a list of examples, those examples are generally considered illustrative rather than exhaustive. See, e.g., Massachusetts v. E.P.A., 127 S. Ct. 1438, 1476 (2007) (Scalia, J., dissenting) ("The word 'including' . . . indicate[s] that what follows will be an 'illustrative' sampling of the general category that precedes the word."); United States v. Grassie, 237 F.3d 1199, 1215 (10th Cir. 2001) ("[W]e regard the statutory use of the word 'including' . . . as the preface for a representative or illustrative example, and not as a term of restriction or exclusion for anything not expressly specified."). But "canons [of construction] are not mandatory rules. They are guides that 'need not be conclusive.'" Chickasaw Nation v. United States, 534 U.S. 84, 85 (2001) (quoting Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 115 (2001)).

However, we need not decide whether the statute should be interpreted in a manner consistent with the canon based on the statute alone because authoritative regulations address the very question at issue. We have explained that when "a relevant statute

14

is silent or ambiguous, we will defer to any reasonable regulations promulgated by the [agency charged with administering the statute]." Bd. of Tr. of Trucking Employees of N.J. Welfare Fund, Inc.-Pension Fund v. Kero Leasing Corp., 377 F.3d 288, 294 (3d Cir. 2004); see also Smriko v. Ashcroft, 387 F.3d 279, 295 (3d Cir. 2004) ("agency regulations 'have the force of law'" (quoting Marshall v. Lansing, 839 F.2d 933, 943 (3d Cir. 1988))); Martinka Coal Co., 202 F.3d at 720 n.2 (4th Cir. 2000) (WARN Act regulations have the force of law "unless they are irreconcilable with the clear meaning of a statute, as revealed by its language, purpose, and history" (internal quotation marks and citation omitted)). The Secretary of Labor is charged with "prescrib[ing] such regulations as may be necessary to carry out" the WARN Act. 29 U.S.C. § 2107(a). Here, the regulations promulgated by the Department of Labor ("DOL") pertaining to "WARN Act enforcement" state that

> [e]nforcement of WARN will be through the courts, as provided in section 5 of the statute. Employees, their representatives and units of local government may initiate civil actions against employers believed to be in violation of § 3 of the Act. The Department of Labor has no legal standing in any enforcement action and, therefore, will not be in a position to issue advisory opinions of specific cases. The Department will provide assistance in understanding these regulations and may revise them from time to time as may be necessary.

20 C.F.R. § 639.1(d) (emphasis added). This provision, unlike the related provision in the statute itself, indicates that only employees, union representatives and units of local government may bring suit. Neither party cites this regulation, much less contends that it is in "conflict with the plain language of the statute." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 292 (1988). Consequently, we will apply the DOL regulation, which compels the conclusion that Plaintiff Funds are not "person[s]" that may enforce the WARN Act.

For the foregoing reasons, we conclude that the District

15

Court correctly concluded that the Plaintiff Funds do not have standing to bring suit under the WARN Act.

### C. "Single Employer"

We next address the question of whether APA Truck Leasing and APA Transport constitute a "single employer" for WARN Act purposes. If the two entities are a "single employer" then we need not reach the question of whether APA Transport may avail itself of the "faltering company" defense, as APA Transport would not be able to demonstrate that it was "faltering" because it would have had adequate capital to operate. For the reasons that follow, we conclude that the District Court correctly determined that APA Transport and APA Truck Leasing cannot be considered a "single employer."

The WARN Act defines the term "employer" as "any business enterprise" that employs 100 or more full-time employees. 29 U.S.C. § 2101(a). The WARN Act does not define "business enterprise"; however, DOL regulations issued under the WARN Act provide that two or more affiliated companies may be considered a single business enterprise for WARN Act purposes. 20 C.F.R. § 639.3(a)(2). The regulations state that "independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as . . . a part of the parent or contracting company depending upon the degree of their independence from the parent." Id.

In Pearson v. Component Technology Corp., 247 F.3d 471 (3d Cir. 2001), we adopted the five factors listed in those regulations to create a balancing test that would determine whether related companies are liable under the WARN Act on "single employer" grounds. The five factors are as follows: (1) common ownership, (2) common directors and/or officers, (3) de facto exercise of control, (4) unity of personnel policies emanating from a common source, and (5) dependency of operations. Id. at 487-90; 20 C.F.R. § 639.3(a)(2). We further indicated that the five-factor test was a balancing test in which a number of facts and circumstances may be relevant. Pearson, 247 F.3d at 490. However, the factors are not balanced equally: the first and second

16

factors, common ownership and common directors and/or officers, are not sufficient to establish that two entities are a "single employer." Id. at 494 ("ownership – and even ownership coupled with common management – is not a sufficient basis for liability").

In the context of summary judgment, we held that the "WARN Act test for intercorporate liability presents a question of fact," but noted that "[our] decision to characterize it as such does not preclude an inquiry as to whether plaintiffs have put forth enough evidence to create a genuine issue of material fact." Id. at 497. In fact, in Pearson itself, we applied the test and concluded that the "evidence proffered by the plaintiffs simply [did] not establish the high degree of integration required by the analysis set forth in this opinion" to survive summary judgment. Id. at 505.

Here, the District Court concluded that the evidence was not sufficient to create a genuine issue of material fact, and held that APA Transport and APA Truck Leasing[8] could not be considered a "single employer" for WARN Act purposes. While the Employee Plaintiffs had demonstrated (and APA Transport and APA Truck Leasing did not dispute) "common ownership" and "common directors and/or owners" (the first two factors), as APA Transport and APA Truck Leasing shared all of the same stockholders and maintained the same presidents and vice-presidents, the District Court then determined that the third, fourth and fifth factors weighed against the conclusion that APA Transport and APA Truck Leasing should be considered a "single employer." For the

---

[8] In Pearson, we noted that "[n]either the WARN Act itself, nor the regulations, explicitly discuss the statute's applicability to lenders," but rather focus on entities with parent-subsidiary relationships. 247 F.3d at 491. However, we ultimately concluded that "under some circumstances, a lender can become so entangled with its borrower's affairs so as to engender WARN Act liability." Id. Thus companies with a lendee-lender relationship – such as APA Truck Leasing and APA Transport – may be considered a "single employer" for WARN Act purposes. In any event, APA Transport and APA Truck Leasing do not dispute the applicability of the Pearson framework.

third factor, "de facto exercise of control," the District Court found that lower levels of management at the two companies were supervised on a company-by-company basis, and that as such there was autonomy in supervision. In re APA Transport, 2006 WL 3534029, at *13. The District Court also found that despite intercompany loans, the two companies were autonomous in terms of finances because each company had independent wage rates, pay scales, salaries and payrolls. Id. For the "unity of personnel policies emanating from a common source" factor, the District Court found that each company possessed its own employees and its own policies regarding compensation, vacation and sick time; that the companies hired and fired employees on an individual basis; and that, to a large extent, personnel files were maintained separately. Id. at *14. Finally, for the "dependency of operations" factor, the District Court relied on its analysis for the third and fourth factors and determined that it weighed in favor of APA Transport and APA Truck Leasing as well. Id.[9] As only the first two factors weighed in favor of the Employee Plaintiffs, and these two factors alone are not sufficient to demonstrate that two entities are a "single employer," the District Court concluded that APA Truck Leasing and APA Transport "[could not] reasonably be considered a 'single employer' for WARN Act purposes." Id.

On appeal, the Employee Plaintiffs do not dispute the underlying factual findings of the District Court, but contend that there is a genuine issue of material fact as to the ultimate question of whether APA Transport and APA Truck Leasing constitute a "single employer." We disagree. As we stated earlier, that the balancing test requires a fact-intensive analysis does not "preclude an inquiry as to whether plaintiffs have put forth enough evidence

---

[9] This approach was improper, because the analysis for the "dependency of operations" factor, which considers the general administrative structure of two related entities, differs from the analysis for the "de facto exercise of control" and "unity of personnel policy" factors, which look to decision-making and personnel policies of the two entities, respectively. However, despite this oversight, the District Court reached the proper conclusion for this factor.

18

to create a genuine issue of material fact." Pearson, 247 F.3d at 491. We agree with the District Court that no reasonable juror, employing the five-factor test, could find that APA Transport and APA Truck Leasing were a "single employer."

As an initial matter, we think it important to consider the policy considerations that animate the WARN Act. The purpose of the Act is to penalize those employers that close a plant and fail to comply with the notice requirements of the statute. Thus, the question of whether two entities constitute a "single employer" for WARN Act purposes "is ultimately an inquiry into whether . . . two nominally separate entities operated at arm's length" or whether, following an "assessment of the amount of control" exercised by one entity over another, it can be determined that two entities should be considered jointly liable for the closing and the subsequent lack of notice. Id. at 495-96. Accordingly, the goal of the five-factor test here is to determine whether APA Truck Leasing had become "so entangled with [APA Transport's] affairs so as to engender WARN Act liability," or whether the two continued to function at arm's length as separate entities. Id. at 491.

Turning to the decision of the District Court, we note it was correct to conclude that the first two factors – "common ownership" and "common directors and/or owners" – are not sufficient to deem two entities a "single employer." The Employee Plaintiffs are thus incorrect to argue that they should survive summary judgment on the "single employer" issue solely because APA Truck Leasing and APA Transport were owned by the same individuals and shared directors and officers.

Consequently, the remaining three factors are determinative. Factor three looks to whether there was "de facto exercise of control" of APA Trucking by APA Transport or vice versa. The core of this factor is whether one company "was the decision-maker responsible for the employment practice giving rise to the litigation." Id. at 503-04. Here, a review of the facts adduced by the parties indicates that while APA Truck Leasing may have made certain loans to APA Transport and shared certain administrative functions, it was not "controlling" APA Transport and played no

19

role in APA Transport's decision to close its facilities. Thus, factor three does not support a finding that APA Transport and APA Truck Leasing constitute a "single employer."

Factor four looks to whether there was a "unity of personnel policies." The overall question is whether the companies "actually functioned as a single entity with regard to [their] relationship[] with employees." Id. at 499. To reach an answer, we consider whether the two companies in question engaged in centralized hiring and firing, payment of wages, and personnel and benefits recordkeeping. See Vogt v. Greenmarine Holding, 318 F. Supp. 2d 136, 142-43 (S.D.N.Y. 2004). While the two companies did share certain benefit plans and some employee monitoring functions (specifically, APA Transport did the background security checks for APA Truck Leasing's new hires, and machinists at both companies were given the opportunity to bid for positions at the other company), there is no evidence that the two companies "actually functioned as a single entity" with regard to their respective employees. Pearson, 247 F.3d at 499. Employees were hired and fired independently; reported separately to supervisors at their respective companies; were paid from separate payrolls; reported tax obligations to the federal government under separate ID numbers keyed to their company; and had separate labor contracts. This factor also does not support a finding that APA Transport and APA Truck Leasing were a "single employer."

The fifth and final factor is whether there was a "dependency of operations" between the two companies. To determine whether two companies are dependent on one another, we look to the "existence of arrangements such as the sharing of administrative or purchasing services, interchanges of employees or equipment, and commingled finances." Id. at 500 (citations omitted). Although the Employee Plaintiffs insist that the two companies commingled finances, the record indicates that the loans between APA Truck Leasing and APA Transport were made at arm's length. Moreover, APA Transport and APA Truck Leasing were clearly not "dependent" upon one another to continue operation, and there is no stronger evidence for this fact than that APA Truck Leasing continued to operate without incident after APA Transport folded. Thus, the fifth factor also cannot support

20

a finding that APA Transport and APA Truck Leasing were a "single employer."

Because the final three factors are clearly in favor of APA Transport and APA Truck Leasing, and because a finding that two companies share the same ownership and certain directors (the first two factors) is not in and of itself sufficient to find that two entities were a "single employer," we conclude that no reasonable juror could find that APA Transport and APA Truck Leasing functioned as a "single employer" based on the facts presented. We therefore affirm the District Court's decision on this issue.[10]

---

[10] In reaching its conclusion, the District Court stated that

> no genuine question of material fact has been set forth by [the Employee] Plaintiffs. [The Employee] Plaintiffs set forth facts that [APA Transport and APA Truck Leasing] do not refute, rather, [APA Transport and APA Truck Leasing] point to additional evidence to support their assertion that they are not "employers" under WARN. As such, the Court will apply the uncontradicted evidence provided to the DOL factors referenced by the Third Circuit Court of Appeals in determining whether [APA Transport and APA Truck Leasing] can be considered a single employer for WARN Act liability purposes.

In re APA Transport, 2006 WL 3534029, at *12. As we have held that the five-factor test for intercorporate liability is a question of fact, Pearson, 247 F.3d at 497, a district court cannot reach its own independent conclusion about how those factors should be balanced. Instead, a district court can only grant summary judgment for a defendant if no reasonable juror could engage in the appropriate balancing and determine that the two entities constitute a "single employer." If a reasonable juror could weigh the facts under the balancing test and come out either way – that is, if there is sufficient evidence in the record to support either finding – then the question of whether the two entities constitute a "single

21

**D.      The "Faltering Company" Exception**

The Employee Plaintiffs' final argument is that the District Court erred when it granted summary judgment to APA Transport and APA Truck Leasing on the question of whether APA Transport qualified for the "faltering company" exception to the WARN Act notice requirement. As noted above, if we had determined that APA Truck Leasing and APA Transport were a "single employer" for WARN Act purposes, then the "faltering company" defense would not be available because APA Transport would have had adequate capital to continue to operate. However, we have concluded that no reasonable juror could find that the two companies constitute a "single employer." Therefore, we must focus on the question of whether APA Transport has established the elements of its affirmative defense sufficient to survive summary judgment. For the reasons that follow, we conclude that APA Transport cannot avail itself of the "faltering company" defense.

The faltering company exception is an affirmative defense to liability, which means the employer bears the burden of establishing its elements. 20 C.F.R. § 639.9. As a threshold matter, a company seeking to qualify as a "faltering company" must demonstrate that it had inadequate capital to continue functioning and, as such, was in a "faltering" state. Id.

The statutory provision states that

---

employer" must be submitted to a jury. See, e.g., Am. Ad Mgmt., Inc. v. GTE Corp., 92 F.3d 781, 791 (9th Cir. 1996) (when the "law clearly envisions that [a] balancing test is normally reserved for the jury . . . summary judgment is only appropriate if after viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact"). To the extent that the District Court did its own balancing instead of determining whether no reasonable juror could reach a different outcome, it did so in error.

[a]n employer may order the shutdown of a single site of employment before the conclusion of the 60-day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business.

29 U.S.C. § 2102(b)(1). The DOL regulation interpreting the "faltering company" exception of the WARN Act breaks the provision into its component parts, so that to benefit from the defense an employer must prove: (1) it was actively seeking capital at the time the 60-day notice would have been required, (2) it had a realistic opportunity to obtain the financing sought, (3) the financing would have been sufficient, if obtained, to enable the employer to avoid or postpone the shutdown, and (4) the employer reasonably and in good faith believed that sending the 60-day notice would have precluded it from obtaining the financing. 20 C.F.R. § 639.9(a).

According to the Conference Report issued when Congress passed the WARN Act, the key elements of the defense, which is intended as a "narrow one," are

that the employer was "actively seeking capital or business"; second that, had the employer obtained this capital or business, it "would have enabled the employer" to prevent or forestall the shutdown; and third, that the employer "reasonably and in good faith believed" that giving the notice required would have precluded the employer from obtaining the necessary capital or business that it had a realistic opportunity to obtain. Thus, to avail itself of this defense <u>an employer must prove the specific steps it had taken, at or shortly before the time notice would have been required</u>, to obtain a loan, to issue bonds or stock, or to secure new business. This duty to

23

seek capital or business falls on the employer . . . .

134 CONG. REC. S8686-01 (1988) (emphasis added). The central aspects of Congress's stated purpose have been codified in the DOL regulations; namely, that the faltering company defense should be construed narrowly and that, to access the defense, the employer must demonstrate that it was taking the specific steps required "at the time that 60-day notice would have been required." 20 C.F.R. § 639.9(a)(1).

Before this Court, the Employee Plaintiffs challenge only the first two of the four elements of the defense, asserting that APA Transport was not actively seeking capital at the time the 60-day notice would have been required, and that it did not have a realistic opportunity to obtain that financing. The Employee Plaintiffs have thus conceded the final two elements (that the financing, if obtained, would have been sufficient to prevent a shutdown; and that APA Transport reasonably believed that giving WARN Act notice would have hindered its ability to get that financing), and we will not discuss them here. We note that for the two elements we will consider, we must conclude that APA Transport has established both elements in order to uphold the District Court's decision. Furthermore, we note that the parties do not argue that there are material underlying facts in dispute. Appellants' Br. at 48-52; Appellees' Br. at 18-22.

The District Court concluded that APA Transport had been "actively seeking" financing based on APA Transport's meeting with Transamerica on October 24, 2001 and its request at that time for additional financing. It stated that it was "not reasonable to insist that APA Transport take specific, actual and literal steps on December 20, 2001, when they had taken said steps on October 24, 2001." In re APA Transport, 2006 WL 3534029, at *17. The District Court explained that to require APA Transport to take such "specific, actual and literal steps" would "effectively eliminate any practical application of the 'faltering business' exception as it would require said employer to read the minds of the financial institution or institutions from which it seeks its financing." Id.

24

On appeal, the Employee Plaintiffs assert that the District Court misstated the timeline of events in its opinion. The District Court found that at the October 24, 2001 meeting, APA Transport offered mortgages on two properties to secure additional financing from Transamerica. Our review of the record indicates that the Employee Plaintiffs are correct, as APA Transport did not offer those mortgages to Transamerica until January 2, 2002. APA Transport concedes this point.

The Employee Plaintiffs argue that this discrepancy is significant; although Transamerica and APA Transport discussed in general terms APA Transport's need for additional financing at the October 24, 2001 meeting, there was no affirmative attempt by APA Transport after that meeting to actually secure that financing. The offer of the properties did not occur until January 2, after the 60-day period set forth by the WARN Act had begun. On these facts, the Employee Plaintiffs contend that APA Transport cannot prove that it was "actively seeking" financing when the period began.

APA Transport makes two arguments in response. First, it agrees with the District Court that APA Transport was not required to take specific steps at or near the beginning of the 60-day window because such a requirement "ignores the reality that prediction of the date a company will need to shut down is not an exact science" and would mean that companies would be ineligible for the exception because they started their financing efforts "too late to save the company." Appellees' Br. at 22. Second, APA Transport contends that it was in fact "actively seeking" financing at the beginning of the period. It argues that it indicated that it would seek additional financing from Transamerica at the October 24, 2001 meeting, and that once a "lender confirms that the borrower was seeking capital, that should be the end of the inquiry" as to whether the borrower was "actively seeking" capital. Id. at 19. APA Transport further contends that the Court should take into account that business decisions "can take some time and that the year-end holidays . . . occurred in the interim" so that there should have been no expectation that APA Transport would take additional steps in December 2001 to secure the financing. Id.

25

We turn first to APA Transport's argument that the District Court was correct to hold that it was "not reasonable to insist that APA Transport take specific, actual and literal steps on December 20, 2001," when the 60-day period began, <u>In re APA Transport</u>, 2006 WL 3534029, at *17, because "prediction of the date a company will need to shut down is not an exact science." Appellees' Br. at 22. This approach essentially asks this Court to read a "foreseeability" requirement into the faltering business exception: in APA Transport's view, if an employer does not foresee that it is 60 days away from a plant closing, it should not be held liable for failing to take specific steps at the time to secure financing. We believe such an approach runs counter to both the text and the purpose of the WARN Act.

The plain language of the statute states that a company must be actively seeking additional financing "as of the time that notice would have been required." 29 U.S.C. § 2102(b)(1); <u>see also</u> 20 C.F.R. § 639.9(a) ("[a]n employer must have been actively seeking capital or business <u>at the time that 60-day notice would have been required</u>" (emphasis added)). In effect, the WARN Act establishes "strict liability": an employer must give notice 60 days prior to a plant closing, unless it can demonstrate that it falls within one of three specific enumerated exceptions: (1) the "faltering company" defense, (2) the "unforeseeable business circumstances" exception, or the (3) "natural disaster" defense. 29 U.S.C. § 2102(b); 20 C.F.R. § 639.9. The "unforeseeable business circumstances" exception, which provides for a reduction in the notice period for "business circumstances that were not reasonably foreseeable" at the 60-day mark, with circumstances "not reasonably foreseeable" defined as "some sudden, dramatic, and unexpected action or condition outside the employer's control," indicates that Congress was not blind to the issue of foreseeability. 20 C.F.R. 639.9(b)(1). But APA Transport does not contend that it qualifies for the "unforeseen business circumstances" exception. Rather, APA Transports appears to contend that a company may qualify for the "faltering company" defense irrespective of whether it was actively seeking capital at the time notice was required, so long as it did not foresee the shutdown that occurred 60 days later. APA Transport does not point to any statutory language that supports its position. The DOL regulations, moreover, instruct that the "faltering

26

company" exception is to be "narrowly construed." 20 C.F.R. § 639.9(a). To allow employers to invoke the defense by arguing that they did not know a shutdown was 60 days away would risk allowing the "faltering company" exception, which is an affirmative defense, to swallow the statute. We are not unsympathetic to APA Transport's argument, but it is one that should be directed to Congress, not this Court. Our obligation is "limited to one of statutory interpretation." In re Columbia Gas Sys. Inc., 33 F.3d 294, 302 (3d Cir. 1994) ("when a statute is clear and unambiguous, policy arguments cannot deflect us from that interpretation"); see also Coraggioso v. Ashcroft, 355 F.3d 730, 734 (3d Cir. 2004) ("We are compelled . . . to interpret the statute as written."). Consequently, we conclude that the WARN Act does require that steps to "actively seek financing" be taken "at the time that 60-day notice would have been required." 20 C.F.R. § 639.9(a)(1).

We turn next to the question of whether APA Transport was in any event "actively seeking" financing on December 20, 2001 to a degree sufficient to assert the "faltering company" defense. We must assume that Congress included the word "actively" in the statute for a reason. See Citizens Council of Delaware County v. Brinegar, 741 F.2d 584, 591 (3d Cir. 1984) ("[W]e presume that the words Congress has chosen best reflect the legislative purpose." (internal quotation marks and citations omitted)); see also Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used."). The word "actively" is generally understood to mean "characterized by action rather than by contemplation or speculation." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 22 (1993). The DOL regulations provide that "actively seeking" means "seeking financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of internally generated financing; or the employer must have been seeking additional money, credit or business through any other commercially reasonable method." 20 C.F.R. § 639.9(a)(1).

The record indicates that APA Transport and Transamerica met on October 24, 2001 to discuss APA Transport's future. We

27

note that it was Transamerica, and not APA Transport, that requested the meeting; and that it was Transamerica, and not APA Transport, that affirmatively sought to discuss APA Transport's financial health. There is some confusion as to what exactly was said by Transamerica and APA Transport officials at the October 24, 2001 meeting.[11] However, even if we accept APA Transport's position that, at the end of that meeting, a representative of APA Transport stated that it would seek additional financing from Transamerica and that Transamerica told APA Transport that all of its "options were open" for extending the loan, (J.A. 1465a.), this single exchange – which did not constitute a formal request for financing – is insufficient to demonstrate that APA Transport was "actively seeking" financing from Transamerica as of October 24, 2001.

Moreover, the record is clear that between the October 24, 2001 meeting and the January 2, 2002 offer of two mortgaged properties APA Transport took no steps to secure additional financing from Transamerica. Nor did APA Transport take any specific steps to seek an extension of the Loan Agreement which it knew was set to expire on February 28, 2002.[12] APA Transport knew that the terms of the Loan Agreement required that a request for such an extension had to be made in writing; no such request was made at any time prior to the 60-day period (or afterwards). APA Transport's actions can, at best, be characterized as waiting

---

[11] The District Court appeared to resolve this dispute by crediting the testimony of a Transamerica executive, stating that his recollection of the meeting "settled that dispute" as to the definitive version of events. In re APA Transport, 2006 WL 3534029, at *16. To do so at summary judgment is improper. See Country Floors, Inc. v. P'ship Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1991) ("credibility evaluations are inappropriate in deciding a motion for summary judgment").

[12] While APA Transport did sign an agreement with Transamerica on December 10, 2001 to cure certain defaults in the existing loan with Transamerica, this agreement did not secure any additional financing for APA Transport. Nor did APA Transport seek any additional financing in conjunction with the agreement.

28

for Transamerica to offer additional financing. This cannot be squared with the requirement that APA Transport be "actively seeking" additional financing.

We therefore conclude that no reasonable juror could find that APA Transport met its burden for prevailing on this element of the defense. As APA Transport must fulfill all four requirements of the "faltering company" affirmative defense in order to qualify for the defense, we conclude that the District Court erred in granting summary judgment to APA Transport on this issue.

## III.    Conclusion

For the foregoing reasons, we affirm the District Court's judgment that the Plaintiff Funds do not have standing pursuant to the WARN Act and that APA Transport and APA Truck Leasing cannot be considered a "single employer." We reverse the District Court's judgment that APA Transport presented evidence sufficient to establish the "faltering company" affirmative defense, and remand with instructions that the District Court grant summary judgment to the Employee Plaintiffs on this issue, and for further proceedings.