**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 21-1141**

─────────────

HARRY PENNINGTON, III; TIMOTHY LORENTZ, on behalf of themselves and all others similarly situated,

Plaintiffs – Appellants,

v.

FLUOR CORPORATION; FLUOR ENTERPRISES, INC.; SCANA CORPORATION; FLUOR DANIEL MAINTENANCE SERVICES, INC.; SOUTH CAROLINA ELECTRIC & GAS COMPANY,

Defendants – Appellees.

--------------------------------

ASSOCIATED BUILDERS AND CONTRACTORS, INC.; ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC.; SOUTH CAROLINA CHAMBER OF COMMERCE; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,

Amici Supporting Appellees.

─────────────

**No. 21-1143**

─────────────

LAWRENCE BUTLER; LAKEISHA DARWISH; JIMI CHE SUTTON,

Plaintiffs – Appellants,

v.

FLUOR CORPORATION; FLUOR ENTERPRISES, INC.,

       Defendants – Appellees.

------------------------------

ASSOCIATED BUILDERS AND CONTRACTORS, INC.; ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC.; SOUTH CAROLINA CHAMBER OF COMMERCE; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,

       Amici Supporting Appellees.

---

Appeals from the United States District Court for the District of South Carolina, at Rock Hill.  J. Michelle Childs, District Judge.  (0:17-cv-02094-JMC; 0:17-cv-02201-JMC)

---

Argued:  October 27, 2021                    Decided:  November 30, 2021

---

Before WILKINSON, NIEMEYER, and MOTZ, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Judge Motz joined.

---

**ARGUED:**  Jack A. Raisner, RAISNER ROUPINIAN LLP, New York, New York, Charles Anthony Ercole, KLEHR HARRISON HARVEY BRANZBURG LLP, Philadelphia, Pennsylvania, for Appellants.  Charles Theodore Speth II, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Columbia, South Carolina, for SCANA Appellees; John Hagood Tighe, FISHER & PHILLIPS, LLP, Columbia, South Carolina, for Fluor Appellees.  **ON BRIEF:**  René S Roupinian, Isaac Raisner, RAISNER ROUPINIAN LLP, New York, New York; Lee D. Moylan, Rona J. Rosen, Glenn Weiner, KLEHR HARRISON HARVEY BRANZBURG LLP, Philadelphia, Pennsylvania; Amy L. Gaffney, GAFFNEYLEWIS LLC, Columbia, South Carolina; David B. Yarborough, Jr., Reynolds Blankenship, YARBOROUGH APPLEGATE, LLC, Charleston, South Carolina, for Appellants.  D. Michael Henthorne, Christopher R. Thomas, James R. Silvers, Piper R. Byzet, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Columbia, South Carolina, for SCANA Appellees.  David R. Kresser, Matthew R. Korn, FISHER & PHILLIPS LLP, Columbia, South Carolina, for Fluor Appellees.  Stephanie E.

2

Lewis, William R. Gignilliat, Allison Chalmers Hawkins, JACKSON LEWIS P.C., Greenville, South Carolina, for Amici South Carolina Chamber of Commerce and the Chamber of Commerce of the United States of America. Tara S. Morrissey, Stephanie A. Maloney, UNITED STATES CHAMBER LITIGATION CENTER, Washington, D.C., for Amicus Chamber of Commerce of the United States of America. Maurice Baskin, Washington, D.C., Bill Foster, LITTLER MENDELSON, P.C., Greenville, South Carolina, for Amicus Associated Builders and Contractors, Inc. Gregory R. Begg, Michael J.P. Schewe, PECKAR & ABRAMSON, P.C., River Edge, New Jersey, for Amicus Associated General Contractors of America, Inc.

---

WILKINSON, Circuit Judge:

In 2017, SCANA, an electric and natural gas public utility, halted construction at the V.C. Summer Nuclear Station in South Carolina. As a result, Westinghouse Electric Company (WEC), a contractor with SCANA, laid off its employees working at the project, as did Fluor, a subcontractor hired by WEC. Employees of both WEC and Fluor then sued SCANA and Fluor, alleging that the companies had failed to give notice of the plant closure and layoffs as required under the Worker Adjustment and Retraining Notification (WARN) Act. The district court granted summary judgment to both defendants, holding that SCANA was not required to give notice to the employees of contractors working on-site, and that Fluor had complied with the WARN Act. For the following reasons, we affirm.

I.

A.

In 2008, SCANA, along with Santee Cooper, a state-owned electric and water utility, set out to build a nuclear power plant. The project, two nuclear reactors at the V.C. Summer Nuclear Station in central South Carolina, was an ambitious one. Along with an unrelated nuclear reactor in Georgia, V.C. Summer "represent[ed] the first new generation of nuclear power plant construction in the United States in 30 years." J.A. 380. To build the project, the two utilities entered into an agreement with WEC, which was tasked with designing and manufacturing the reactors.

Eight years later, the project was substantially over budget and behind schedule. WEC needed a new subcontractor to manage construction at the site and turned to Fluor,

4

hoping in part that the new construction company could turn the project around. Instead, a bad situation became worse. According to the plaintiffs, Fluor soon conducted an analysis that concluded the project would run a further $6 billion over budget and would take another three years to complete. Furthermore, WEC would be liable for those costs, since it had agreed to build the project for a fixed price. In March 2017, WEC filed for Chapter 11 bankruptcy.

Under an interim agreement between SCANA and WEC, WEC would continue to perform work at the site, while SCANA would make payments to Fluor directly on behalf of WEC. As things stood in the summer of 2017, therefore, SCANA, WEC, and Fluor all continued to work at the plant. SCANA held the license from the Nuclear Regulatory Commission and was required to oversee the project and ensure that the work conformed with the terms of the license. But pursuant to its agreement with SCANA, WEC was solely responsible for the means and methods that it employed. Fluor meanwhile, under the terms of its own agreement with WEC, managed the actual construction on the site. Fluor had no direct contractual relationship with SCANA, aside from the payments made under the interim agreement.

On July 7, 2017, this house of cards finally collapsed when Santee Cooper informed SCANA that it intended to discontinue funding its portion of the project. SCANA could not continue the project on its own and on July 31, after Santee Cooper's board formally voted to suspend funding, SCANA abruptly stopped all construction at the site. It is undisputed that SCANA alone ordered the plant's closure and gave neither Fluor nor WEC any advance notice. SCANA for its part states that there was no closure to announce until

5

Santee Cooper's board actually voted and that SCANA had in fact spent much of July looking for other partners to replace Santee Cooper. Moreover, any advance notice of the project's closure could violate insider trading laws and would jeopardize ongoing efforts by SCANA and Santee Cooper to recover a contractual guarantee from WEC's parent company, Toshiba. When the site closed, Fluor and WEC laid off a total of approximately 4,000 workers employed at the project.

## B.

Following the plant closure, employees at WEC and Fluor filed a class action complaint against SCANA and Fluor in federal district court, contending that the two companies had violated their obligations under the WARN Act.

That statute was "adopted in response to the extensive worker dislocation that occurred in the 1970s and 1980s." *Hotel Emps. & Rest. Emps. Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 182 (3d Cir. 1999). In many cases, businesses shut down or laid off workers after giving them little or no notice, a practice that the WARN Act was designed to eliminate. *See* Marisa Anne Pagnattaro, *The Perils of Control: Affiliated Liability Under the WARN Act*, 41 Am. Bus. L.J. 313, 318 (2004) (citing H.R. Rep. No. 100-285, at 11 (1987)). The "overarching aim" of the statute is "to provide advance notice of worker dislocations to affected workers, unions, and governments." Richard W. McHugh, *Fair Warning or Foul? An Analysis of the Worker Adjustment and Retraining Notification (WARN) Act in Practice*, 14 Berkeley J. Emp. & Lab. L. 1, 4 (1993).

The WARN Act achieves this goal primarily through a provision that requires covered employers to give sixty days of written notice before ordering a plant closing or a mass layoff. *See* 29 U.S.C. § 2102(a). The employer must give this notice to each "affected employee," or to their union representative, as well as to the state and the unit of local government where the closing or layoff occurs. *See id.* An employer who runs afoul of the statute is liable to each aggrieved employee for back pay during the period of the violation, as well as civil penalties of $500 per day to the local government involved. *See id.* § 2104(a)(1)–(3).

## C.

As the case progressed, SCANA and Fluor moved for summary judgment. SCANA argued that it was not liable under the WARN Act since it had not employed any of the plaintiffs, all of whom worked for either WEC or Fluor. And Fluor argued that it could not reasonably have foreseen SCANA's sudden closure of the plant and that it therefore was relieved of liability under a statutory exception for unforeseeable business circumstances. *See* 29 U.S.C. § 2102(b)(2)(A).

The district court agreed, granting summary judgment to both SCANA and Fluor in a thorough and thoughtful opinion. *See Butler v. Fluor Corp.*, 511 F. Supp. 3d 688 (D.S.C. 2021). The court first held that SCANA was not an "employer" of the plaintiffs under a multi-factor test enumerated by the Department of Labor. *See id.* at 698 (citing 20 C.F.R. § 639.3(a)(2)). The court noted, for instance, that SCANA had no ownership interest in WEC or Fluor, nor did it share any common directors or officers with those companies. *Id.*

7

at 700. Likewise, the companies were "wholly independent and unaffiliated" and there was no evidence in the record that SCANA had integrated its personnel policies with those of WEC or Fluor. *Id.* at 707–11. And on one important factor, the "de facto exercise of control," the court reviewed the record extensively, *see id.* at 700–07, and concluded that SCANA had not exerted greater control over Fluor or WEC than "would be expected between an independent contractor and a principal client, particularly in a highly regulated industry," *id.* at 707. Accordingly, the district court held that SCANA had not been required to give notice to the plaintiffs. *Id.* at 711.

The court then considered Fluor's liability under the statute. The court concluded that the abrupt shutdown, which Fluor had not anticipated, qualified as an unforeseeable business circumstance and that Fluor was thus exempted from giving 60 days of notice. *Id.* at 713–19 (citing 29 U.S.C. § 2102(b)(1)(2)(A)). The court also determined that Fluor had complied with the statutory requirement that it send notice as soon as practicable, *see* 29 U.S.C. § 2102(b)(3), since the company mailed notice to its employees in the days following the closure of the plant, *see Butler*, 511 F. Supp. 3d at 719–20.

The plaintiffs timely appealed the district court's grant of summary judgment to this court. We review orders granting summary judgment *de novo*, viewing the evidence in the light most favorably to the nonmovant. *Monahan v. Cnty. of Chesterfield*, 95 F.3d 1263, 1265 (4th Cir. 1996). We affirm a grant of summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## II.

We begin by addressing SCANA's liability under the WARN Act. The plaintiffs contend that SCANA functioned as their "employer" for WARN Act purposes, even though they were employed by contracting firms entirely unaffiliated with SCANA. But such an interpretation would go beyond the textual limits of the statute and its implementing regulations and would subject plant owners to the prospect of uncertain and ill-defined liability.

## A.

The basic premise of the WARN Act is that firms must provide their *own* employees with notice before closing a plant. The operative provision of the Act states that "[a]n *employer* shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order" to "each affected *employee*" (or their union representative) and to the local government. 29 U.S.C. § 2102(a) (emphasis added). "[A]ffected employees" are in turn defined as "employees who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff *by their employer*." *Id.* § 2101(a)(5) (emphasis added). The WARN Act regulations explicitly state that "contract employees who have a separate employment relationship with another employer and are paid by that other employer" do not qualify as "affected employees." 20 C.F.R. § 639.3(e).

This focus on the employer-employee relationship is quite natural. It reflects the basic purpose of the statute, which was to prevent businesses from leaving their workers

out in the cold after abruptly closing a job site. As Senator Kennedy put it, the statute was designed to reflect "the American value of fairness, fairness to men and women who have devoted in many instances their lifetime to a particular corporation, a particular business, and a particular industry and deserve more than a pink slip at the end of a Friday afternoon to indicate to them that their lives will be disrupted." 100 Cong. Rec. S. 16671 (daily ed. July 6, 1988) (statement of Sen. Kennedy).

The notice requirement thus gives a company's employees, as well as the overall community, some time to adapt and make plans for the impending closure or layoff. *See* 20 C.F.R. § 639.1. This is a weighty and important obligation, but it is not unlimited. There is no provision in the statute requiring employers to give notice or render assistance to other firms or workers that may be touched by a plant's closure. Instead, the statute imposes an obligation that is both definite and achievable. The scope of liability is clear, since it extends precisely to a company's own employees, so businesses need not make difficult judgment calls as to which unaffiliated firms are likely to have employees affected in some way by a plant closure. And compliance is also straightforward, since it will usually be easier for a company to communicate and provide notice to its own employees than to other members of the general workforce. *See* 20 C.F.R. § 639.7 (detailing the different requirements that notice to various recipients must contain).

Thus the text of the statute, as well as its basic purpose, indicates that the plaintiffs do not have a valid claim against SCANA. None of them were in any common sense of the word "employees" of SCANA; instead, they either worked for WEC, a contractor hired by SCANA, or for Fluor, a subcontractor hired by WEC and with no direct contractual

10

relationship to SCANA at all. And as to its own employees, SCANA complied with the WARN Act by providing 60 days of compensation beginning on the day of the project's closure, thereby satisfying its obligations under the statute. *See Long v. Dunlop Sports Grp. Ams., Inc.*, 506 F.3d 299, 303 (4th Cir. 2007).

B.

Plaintiffs, however, say this fails to resolve the matter. Even though they were not formally employed by SCANA, they argue that SCANA should nonetheless be treated as their employer for WARN Act purposes. They contend that, by shutting down the plant without giving notice to WEC or Fluor, SCANA compelled the contractors to lay off employees without the required 60 days of notice. As a result, they suggest, SCANA should be held responsible as the "employer" of these laid-off workers.

This argument simply cannot be squared with the statute—whether as examined on its face, as construed by the agency, or as interpreted by the courts. It is true that in some instances distinct businesses may count as the same employer for the purposes of the WARN Act. This would be the case where the operational differences between the two companies are purely formal, so that for all intents and purposes the businesses really do operate as the same employer. *See Pearson v. Component Tech. Corp.*, 247 F.3d 471, 495 (3d Cir. 2001) (noting that the proper inquiry is "into whether the two nominally separate entities operated at arm's length").

In fact, the cases where courts have imposed single-employer liability have generally involved the parent companies of wholly owned or closely held subsidiaries. *See,*

11

*e.g.*, *Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 227–28 (2d Cir. 2013); *Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1006–07 (9th Cir. 2004); *Hampton v. Navigation Cap. Partners, Inc.*, 64 F. Supp. 3d 622, 629 (D. Del. 2014). *But see In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 244–45 (3d Cir. 2008) (declining to impose liability where affiliate is autonomous in its management and decision-making); *Wholesale & Retail Food Distrib. Local 63 v. Santa Fe Terminal Servs., Inc.*, 826 F. Supp. 326, 334–35 (C.D. Cal. 1993) (same).

1.

Independent contractors, not subsidiaries, employ the plaintiffs in the case at bar. The Department of Labor has provided a framework for determining whether independent contractors should be considered part of the contracting company for WARN Act purposes, "depending upon the degree of their independence" from the contracting company. 20 C.F.R. § 639.3(a)(2). In making this determination, "[s]ome of the factors to be considered . . . are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations." *Id.* These factors are not exhaustive and in the past some courts employed them alongside other tests to determine corporate liability. *See, e.g.*, *Local 397, Int'l Union of Elec., Elec. Salaried Mach. & Furniture Workers v. Midwest Fasteners, Inc.*, 779 F. Supp. 788, 792–800 (D.N.J. 1992). We agree, however, with the Third Circuit's decision in *Pearson* that "the [Department of Labor] factors are the best method for determining WARN Act liability because they were created with WARN Act policies in mind." 247 F.3d at 489; *see also Guippone*, 737 F.3d at 226 (adopting this

approach); *Administaff Cos., Inc. v. N.Y. Joint Bd., Shirt & Leisurewear Div.*, 337 F.3d 454, 458 (5th Cir. 2003) (same).

At the outset, we note that none of the five factors indicates that liability may extend from a direct employer to an operationally independent and unaffiliated company. Instead, each factor assesses the degree of control or affiliation between the entities at issue. Here, the district court carefully applied these criteria to the facts of SCANA's relationship with WEC and Fluor and concluded that all five either favored the defendants or at least did not favor the plaintiffs. *See Butler*, 511 F. Supp. 3d at 698–711.

We agree with that analysis. It is immediately clear that several of the factors are not met: On the first two factors, there was no common ownership between SCANA and WEC or Fluor, nor did they share any directors or officers. On the fourth factor, "unity of personnel policies," WEC and Fluor were responsible for hiring, firing, and paying their own personnel. They, not SCANA, decided which employees would be responsible for accomplishing which tasks. *See* J.A. 2027, 2034, 2038. As the district court noted, WEC and Fluor employees did not even receive SCANA's employee handbook, nor were they at all integrated with SCANA's human resources department. *See Butler*, 511 F. Supp. 3d at 708; J.A. 2185, 2236. And there was no "dependency of operations" since WEC and Fluor operated "distinct businesses that were not dependent" on SCANA. *McKinney v. Carlton Manor Nursing & Rehab. Ctr., Inc.*, 868 F.3d 461, 464 (6th Cir. 2017). The firms operated as "completely separate entities in completely different industries." *Butler*, 511 F. Supp. 3d at 710. Indeed, both companies functioned on a global scale, managing other unrelated projects during the events in question, and Fluor continued to operate on its own

13

following the closure of the project. *See* J.A. 2030, 2073. These are powerful indicia of independence. *See In re APA*, 541 F.3d at 245 ("[T]here is no stronger evidence" that dependency of operations is not met "than that [one company] continued to operate without incident after [the other company] folded."). Factors (i), (ii), (iv), and (v), therefore, all indicate that SCANA does not qualify as a relevant "employer."

The plaintiffs hardly contest any of this. Instead, they rest their appeal almost exclusively on factor (iii), de facto exercise of control. But even assuming *arguendo* that this factor could somehow be dispositive on its own, the record makes clear that it is not satisfied here.

2.

De facto exercise of control applies where one company is "the decisionmaker responsible for the employment practice giving rise to the litigation." *Pearson*, 247 F.3d at 503–04. The factor thus incorporates a longstanding theory of affiliate liability that holds parents accountable where they are directly liable for the actions of a subsidiary. *See id.* at 486–87, 490. The plaintiffs contend that SCANA satisfied this test by abruptly shuttering the reactors at V.C. Summer without giving advance notice to Fluor or WEC. This decision, they argue, led ineluctably to WEC and Fluor laying off their employees without the required 60 days of notice. Therefore, the argument goes, SCANA was directly liable for the fact that these employees failed to receive the 60 days of notice to which they were entitled.

This argument misapprehends the nature and purpose of the direct liability test. That test did not develop as a general causal inquiry to allocate blame between unaffiliated

14

companies. Rather, it developed as a basis for liability in the specialized context of parent-subsidiary relationships. It remains a narrow test, one that is designed to apply in the unusual case where a company commits a wrongful act through the legal form of a distinct entity. *See DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 683 (4th Cir. 1976) ("'[I]n an appropriate case and in furtherance of the ends of justice,' the corporate veil will be pierced, and the corporation and its stockholders 'will be treated as identical.'" (quoting 18 Am. Juris 2d at 559)). The background of the direct liability test makes this clear. As the Supreme Court has put it, "[i]t is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (quoting William O. Douglas & Carrol M. Shanks, *Insulation from Liability Through Subsidiary Corporations*, 39 Yale L.J. 193, 193 (1929)). Liability may attach on a finding that the parent company acted through the subsidiary with respect to a discrete act or transaction. *See Esmark, Inc. v. NLRB*, 887 F.2d 739, 756 (7th Cir. 1989); *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 981 (4th Cir. 1987) (stating that liability in the employment context may attach to a parent that "control[s] the employment practices and decisions of the subsidiary"). The theory of direct liability, however, does not translate easily outside of the parent-subsidiary context since "[a] third party," unlike a parent corporation, confronts a corporation "as an independent entity, with its own decisionmaking apparatus geared towards advancing [its] independent interests." *Esmark*, 887 F.2d at 756.

In the WARN Act context, courts have found direct liability only in two circumstances. First, and unsurprisingly, courts have applied the test to parent-subsidiary relationships where the parent through its own management is responsible for a WARN Act violation. *See, e.g.*, *Guippone*, 737 F.3d at 227–28; *Garner v. Behrman Brothers IV, LLC*, 260 F. Supp. 3d 369, 378–79 (S.D.N.Y. 2017). Second, the test may also apply to certain lender-borrower relationships where the lender's contractual rights give it an unusual degree of control over the borrower. *See Pearson*, 247 F.3d at 492–94. After all, "it will not always be clear when a party should be characterized as a 'lender,' when a party should be characterized as a parent or owner, and when a party occupies both roles." *Id.* at 493. Applying direct liability in this context reflects the reality that lenders may "exercise such pervasive control over a delinquent borrower's business operations . . . that the borrower is no longer 'independent' of the lender." *McKinney*, 868 F.3d at 465. But such cases, "in which the loan agreement allows the lender to take control of a borrower who cannot repay a loan, offer[] a poor analogy to a . . . relationship that is arm's length from beginning to end." *Id.*

3.

Direct liability is less applicable to a situation such as this one. SCANA was neither parent nor lender to WEC or Fluor. All three businesses were unaffiliated, contracting with each other at arm's length. It is not unusual for one company to make a business decision that causes unaffiliated companies to modify their own operations. Indeed, the WARN Act regulations explicitly contemplate such a scenario. *See* 20 C.F.R. § 639.9(b)(1) (referencing "[a] principal client's sudden and unexpected termination of a major contract

16

with the employer" as an unforeseeable business circumstance). There is simply nothing in the statute, in the regulations, or in settled corporate or agency law, that suggests that a plant owner's decision to close a plant renders the owner liable to the employees of independent and unaffiliated companies who are laid off following that decision. We have no basis for holding that mere ownership of a construction site creates invariable WARN Act liability with regard to those who work with independent companies at the site.

To read such a rule into the statute would substitute an indeterminate test for the straightforward employer-employee standard that Congress adopted. *See* 29 U.S.C. § 2102(a). Under the plaintiffs' test, a plant owner would have to determine which contractors would be covered by the Act and which would not bring into play the Act's obligations. It is hardly clear how the owner could make these judgments about unaffiliated businesses. And it might prove difficult to send the required notice, since there may be no easy way to identify and communicate with workers employed by third parties.

Finally, there is simply no other evidence that SCANA was "the decisionmaker responsible for the employment practice giving rise to the litigation." *Pearson*, 247 F.3d at 503–04. We agree with the district court that "SCANA's control of Fluor and WEC was largely within the expected bounds of a principal client's relationship with its hired contractor or subcontractor." *Butler*, 511 F. Supp. 3d at 702. SCANA was required to oversee the project and ensure that the work conformed with the terms of its regulatory license. But SCANA did not directly manage the work done by WEC or Fluor employees; in fact, SCANA management testified that an employee "could be fired" for directing contractor work. J.A. 2296–97. The contracting employees received instructions and

17

training from their direct supervisors, not from employees at SCANA, and, outside of a limited role in approving key personnel, SCANA had no authority to dismiss any of these employees.

In response, the plaintiffs allude to SCANA's general oversight of the job site as well as to a certain degree of coordination between SCANA and the contractors. For instance, they note that SCANA conducted recurring meetings to plan work at the site, that SCANA consulted with WEC about the project schedule, and that SCANA at times would request corrective action pursuant to its regulatory obligations. But this falls short of "de facto exercise of control." Some degree of cooperation and oversight between owner and contractor is inevitable in any project, and there is little evidence that SCANA transgressed the usual boundaries of this relationship, let alone that it exerted any sort of pervasive control over WEC or Fluor.

In short, the five Department of Labor factors make clear that this case does not meet the standard for single-employer liability. Any different result would need to await the action of Congress. We accordingly affirm the district court's grant of summary judgment to SCANA.

## III.

We turn finally to Fluor's liability under the WARN Act. Unlike SCANA, Fluor plainly employed some of the plaintiffs here. But the district court concluded that Fluor was relieved of any obligation to provide 60 days of notice by the unforeseeable business circumstances exception. *See Butler*, 511 F. Supp. 3d at 718–19. That statutory provision

18

applies where "the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A). The plaintiffs do not contest the application of this provision on appeal, nor could they: it is undisputed that Fluor was taken unawares by SCANA's sudden decision to close the plant. And, as we have seen, the WARN Act's regulations explicitly contemplate "[a] principal client's sudden and unexpected termination of a major contract" as an example of an unforeseeable business circumstance. 20 C.F.R. § 639.9(b)(1). Instead, the plaintiffs contend that Fluor failed to provide "as much notice as is practicable," as is required for employers who rely on the unforeseeable business circumstances exception. 29 U.S.C. § 2102(b)(3). The plaintiffs suggest that Fluor violated this provision by giving notice belatedly and improperly.

We are not persuaded. The record makes clear that Fluor took pains to provide the required information to its employees, even amid the unsettling circumstances of the sudden shutdown. Fluor's HR team drafted and distributed an FAQ document to the Fluor employees on the very day of the shutdown while working remotely from a local hotel. *See* J.A. 4005–06. The following day, Fluor gave notice to state and local officials, and within six business days it began sending a total of 50,000 pages of notice to its employees. *See* J.A. 4006–07, 4221. We agree with the district court that "[s]uch notice was reasonable given the magnitude of the Project, the presence of thousands of workers at the job site, and the abrupt nature of the shutdown." *Butler*, 511 F. Supp. 3d at 719. And while the plaintiffs argue that the notice sent was defective since it failed to include a required telephone number, the regulations are clear that "minor, inadvertent errors" are not "to be

19

the basis for finding a violation of WARN." 20 C.F.R. § 639.7(a)(4). Indeed, the notice contained a specific email address for employees to send questions, and Fluor amended the notice to include the correct telephone number shortly thereafter. *See* J.A. 4222, 4260–61. Accordingly, we conclude that Fluor complied with its requirements under the WARN Act, and we affirm the district court's grant of summary judgment to Fluor as well.

## IV.

We do not discount for a moment the loss and dislocation caused by layoffs and plant closings. The WARN Act takes a large step in mitigating those difficulties. The scheme constructed by Congress reflects a sensitive balance of the competing interests at issue. The trial court was careful to respect that balance, and we in turn are pleased to affirm its judgment.

*AFFIRMED*